UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Stephen Bain,

      Plaintiff,

    v.                                    Civil Action No. 1:06-CV-222

Robert Hofmann, Dr. Susan Wehry,
Dr. Pamela Pedersen, Dr. John
Leppman, Dr. Erin Cody, Dr. Marc
Kutler, Dr. Audrey Kern, Dr. Scott
Strenio, Dr. Stephen Hertford, Dr.
Michael Rousse, Tom Buck, P.A.,
Correctional Medical Services,
Prison Health Services, Inc., John
and Jane Doe medical providers,

      Defendants.

## REPORT AND RECOMMENDATION
(Doc. 76)

Plaintiff Stephen Bain, a Vermont inmate proceeding *pro se*, brings this action claiming that he has not received adequate medical care while in prison.  Pending before the Court is a motion for summary judgment filed by defendants Dr. Susan Wehry, Dr. Pamela Pedersen, Dr. John Leppman, Dr. Erin Cody, Dr. Audrey Kern, Dr. Scott Strenio, Dr. Stephen Hertford, Dr. Michael Rousse, Physician's Assistant Tom Buck, Prison Health Services, Inc., former Department of Corrections Commissioner Robert Hofmann, and Dr. Marc Kutler.  (Doc. 76.)  The remaining named defendant, Correctional Medical Services, has joined the motion for summary judgment.  (Doc. 78.)  For the reasons set

forth below, I recommend that the motion for summary judgment be GRANTED, and that this case be DISMISSED.

## Factual Background

Bain is an inmate under the custody and control of the Vermont Department of Corrections ("DOC"). His complaint alleges that between 1985 and 2002 he was involved in three automobile accidents. In each accident, he allegedly suffered head trauma and spinal injuries. He underwent spinal surgery in 1986 and again in 1990. Bain has been incarcerated since 2003, and claims that he continues to suffer chronic pain and symptoms of traumatic brain injury.

Bain contends that the defendants have been deliberately indifferent to his medical needs in violation of his constitutional rights. Specifically, the complaint alleges that immediately prior to his incarceration, a physician in the community had prescribed Bain narcotics for pain. When he arrived at the Marble Valley Correctional Facility in March 2003, however, the defendants reportedly "removed him from his pain medication . . . with no detoxification." (Doc. 4 at 3.) Bain further alleges that "[h]e has received no meaningful medical treatment since, or prior to, his incarceration, over 40 months ago." *Id.* Bain filed his complaint in November 2006.

At summary judgment, the defendants have chronicled Bain's history of medical care and treatment, with particular focus on pain management. According to Bain's medical records, as summarized in the affidavit of defendant Erin Cody, M.D. (Doc. 76-2), Bain was diagnosed with lumbosacral disc disease prior to 1990, and on March 26, 1990 underwent surgery. In 1992 he was involved in a car accident, after which he

2

complained of "persistent low back pain . . . and migraines." *Id.* at 3.  Dr. Cody's affidavit reports that Bain "had been treating with John Leppman, M.D. in his community practice, and received narcotics for pain control." *Id.*

In 1997, Bain had a medical appointment with Gary Shapiro, M.D., and "told Dr. Shapiro that he felt there was an unwillingness on Dr. Leppman's part to continue prescribing narcotics." *Id.*  Dr. Shapiro's initial prescription, written in July 1997, was for 15 mg of MS-Contin to be added to a previous prescription of 30 mg each morning. After Bain complained that the MS-Contin might be causing impotence, Dr. Shapiro switched him to Oxycontin at 20 mg twice a day.  Bain contends that he requested the switch away from MS-Contin (and Valium) because he did not like "the euphoric side effects." (Doc. 88 at 4.)

By September 1997, Bain reported taking 50mg of OxyContin three or four times a day to control his pain.  Dr. Shapiro "suggested that he consider other pain modifying medications to reduce his reliance on narcotic analgesics." (Doc. 76-2 at 3.)  Days later, Bain returned to Dr. Shapiro for medication beyond the amount prescribed, explaining that he suspected a tenant had been stealing his refills. *Id.*; (Doc. 88 at 5.)  According to Dr. Cody, "although Dr. Shapiro expressed some concern, he renewed the prescription for 90 pills, at 40 mg, to be taken once every 8 hours, and 90 pills, at 10 mg, to be taken once every 8 hours." (Doc. 76-2 at 3.)

In February 1998, Bain altered one of his prescriptions for OxyContin, increasing the number of capsules from 9 to 19.  He initially denied changing the prescription, but later apologized to Dr. Shapiro for his conduct. *Id.* at 4.  "The record states that Bain had

3

been arrested for the offense and would be facing possible incarceration." *Id.* These facts are not specifically disputed.

Bain reports that in February 1998, he persuaded Dr. Shapiro to allow him six months without narcotic analgesics and muscle relaxants while he attended outpatient treatment for education as to prescription use. (Doc. 88 at 5.) The defendants' statement of facts confirms that Bain "underwent outpatient treatment for opiate addiction" during that time. (Doc. 76-2 at 4.) Bain claims that Dr. Shapiro reluctantly allowed him to go without narcotics, but that after six months it was clear that he needed his medications to "improve his function." (Doc. 88 at 6.)

Dr. Cody's review of the medical records reveals that in August 1998, Bain complained to Dr. Shapiro of worsening pain in his back. "Although the examination did not reveal any increased pain with movement," Dr. Shapiro issued a prescription for 1-2 10 mg tablets of OxyContin to be taken every 12 hours. (Doc. 76-2 at 4.) The following week, Dr. Shapiro continued the prescription at 20 mg twice a day. Bain does not recall being prescribed OxyContin at that time, and believes that he "remained on methadone and Valium until May 23, 2003." (Doc. 88 at 6.)

Bain was incarcerated for approximately 9 months beginning in August 1998. Upon his release in 1999, he returned to Dr. Shapiro and complained that he had only been given Tylenol #3 to manage his pain while in prison. Contrary to Bain's "recollection" of not being provided OxyContin, his medical records allegedly indicate that he asked Dr. Shapiro to increase his OxyContin dosage to three times daily. According to Dr. Cody's affidavit, Dr. Shapiro did so reluctantly, noting that "Mr. Bain

4

showed no pain behaviors, and that he was able to talk clearly without any sign of pain during the visit." (Doc. 76-2 at 5.)

In September 1999, Bain informed Dr. Shapiro that a backpack containing his medications had been stolen. Dr. Cody's affidavit states that "[a]ccording to the record, since there was no chronic pain contract between them, Dr. Shapiro issued new prescriptions for the stolen medications, which included OxyContin." *Id.*

Dr. Shapiro eventually increased Bain's OxyContin dosage to 100 mg daily. When Bain continued to complain of pain, Dr. Shapiro capped his dosage at 40 mg every six hours and explained that "this was the ceiling on his medication." *Id.* at 6. Shortly thereafter, Bain reported to Dr. Shapiro that he was using OxyContin more frequently than prescribed, and that he was also using Valium. Three weeks later, Bain informed Dr. Shapiro that he was taking 40 mg of OxyContin up to five times daily. Dr. Shapiro did not increase Bain's OxyContin dosage, and instead prescribed alternative pain medication.

In August 2000, Bain complained to Dr. Shapiro that he had run out of medication early, and that the alternative medications were causing negative side effects. Dr. Shapiro refilled the OxyContin prescription, but informed Bain that his medications would only be available every 30 days. According to Dr. Cody's affidavit, during the following months "Dr. Shapiro continued to refill [Bain's] OxyContin prescriptions even though Mr. Bain admitted to not using them as prescribed, and Dr. Shapiro continued to note in the records that Mr. Bain did not exhibit any pain behaviors." (Doc. 76-2 at 7.)

In mid to late 2001, Dr. Shapiro switched Bain from OxyContin to Methadone. As of the summer of 2002, however, the records indicate that Bain was again taking OxyContin. *Id.*

Bain was incarcerated in May 2003, and has been in DOC custody since that time. Shortly after his arrival in prison, he informed a registered nurse that narcotics were a mandatory part of his treatment and that he had been taking Methadone. The defendants submit that "Mr. Bain was started on detoxification for Methadone upon his arrival." (Doc. 76-2 at 8.) Bain's complaint alleges that he was not provided detoxification. (Doc. 4 at 3.) His statement of disputed facts also submits that, on more than one occasion, the defendants "failed to properly detoxify Plaintiff . . . ." (Doc. 88 at 3.) Medical records submitted with his response, however, indicate that he was placed in a "Detoxification Setting" upon his arrival, and that when he suffered symptoms of withdrawal and diarrhea, he was provided Atarax and Immodium. (Doc. 93-2 at 1-4.)

When Bain met with a nurse in June 2003, he was offered Paraflex and Ibuprofen for pain, but allegedly "refused to take them." (Doc. 76-2 at 9.) In January 2004, Mitchell Miller, M.D. expressed concerns about Bain's history of opiate use, and suggested input from a specialist as to whether narcotics were appropriate. *Id.* According to Bain, Dr. Miller wanted to prescribe "effective doses of methadone and Valium . . . , however, DOC maintains policies that prohibit the dispensing of these effective indicated medications, and they are off formulary." (Doc. 88 at 6.)

In February 2004, Dr. Miller consulted with the Pain Clinic at Dartmouth Hitchcock Medical Center. Clinic staff made various recommendations, including the

6

use of Methadone, while acknowledging that "maintaining a dosage of 200 mg of Methadone a day would be difficult in a prison setting." (Doc. 76-2 at 9.) Dr. Miller started Bain on 5mg of Methadone three times a day, but after Bain complained of continued pain, later raised the dosage to as high as 40 mg four times a day. *Id.*

In October 2004, Bain was allegedly caught "palming" his Methadone, and his prescription was discontinued. Bain denies the palming charge, but agrees that his prescription was "abruptly" discontinued "without appropr[i]ate detoxification at the prevailing standard of medical care, and against manufactur[er']s recommendation." (Doc. 88 at 7.)

In February 2005, Bain was evaluated by Rowland Hazard, M.D. at the Dartmouth Hitchcock Pain Clinic. After Bain explained to Dr. Hazard that he did not exercise or use the prison gym, Dr. Hazard recommended physical therapy and a narcotic-free regimen of pain medications such as Acetaminophen "and perhaps Neurontin." (Doc. 76-2 at 9.) Bain recalls Dr. Hazard telling him that "[M]ethadone is indeed indicated in this case . . . to increas[e] Plaintiff's ability to function," but that Dr. Hazard doubted the DOC would follow his recommendation. (Doc. 88 at 7.) There is no indication in the record that Dr. Hazard shared this latter recommendation with the defendants. Upon his return to prison, Bain complained that Neurontin had not worked previously, and that he should continue on Methadone. (Doc. 76-2 at 9.)

Bain was subsequently seen by Dr. Leppman. As noted above, Dr. Leppman had been one of Bain's treating physicians prior to Bain's incarceration. Bain reportedly informed Dr. Leppman that his pain required narcotics plus Diazepam. Dr. Cody attests

7

that "[b]ased on a review of the chart and input from medical staff about Mr. Bain's responsiveness to Methadone and level of function," Dr. Leppman concluded that "narcotics and Benzodiazepines were not Mr. Bain's best choices."  (Doc. 76-2 at 10.)

In November 2005, Dr. Abigail Hagler prescribed Vicodin at 5 mg twice a day.  A few weeks later, a different physician again suggested Neurontin, and informed Bain that the DOC would inquire about another evaluation by the Pain Clinic.  Dr. Cody states that "[a]t times, Bain refused to take Neurontin.  Flexeril was also prescribed for Mr. Bain, and the records indicate that he failed to show for med pass several times."  *Id.* at 11.

On June 15, 2006, Bain was evaluated at the Pain Clinic by Dr. Daniel Graubert.  Dr. Graubert indicated that the dosages of pain medication Bain was receiving prior to his time in prison were not what he would recommend, and suggested a low to moderate dose of Methadone "at 5-10 mg three or four times a day, or MS-Contin at 60 mg twice a day . . . ."  *Id.*  Prison doctors agreed to provide Bain with Methadone at 10 mg twice a day.  Although Bain contends that this was "just half the recommended low dosage," the Court notes that 20 mg per day was within the range recommended by Dr. Graubert.

Bain continued to receive this level of medication until he was transferred out of state in January 2007.  Although there is no retaliation claim in the complaint, Bain claims in his statement of facts that the transfer was in retaliation for his filing of grievances.  (Doc. 88 at 8.)  Bain has since returned to Vermont, and a recent medical record shows a referral from Dr. Hagler to Dr. Bert Fichman at Dartmouth Hitchcock Medical Center.  For pain management, Dr. Fichman recommended either Tramadol, or if that is ineffective, Methadone at 2.5 to 5mg twice daily.

8

## Discussion

I.   **Summary Judgment Standard**

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has satisfied its burden, the non moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial. Fed. R. Civ. P. 56(e)(2); *Liberty Lobby, Inc.*, 450 U.S. at 250. The non moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248-49; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

II.  **Eighth Amendment and Fourteenth Amendment Claims**

Bain asserts that during his time in DOC custody, he has been both a pre-trial detainee and a convicted inmate. As a pre-trial detainee, Bain's rights were protected under the Fourteenth Amendment, while as an inmate, his claims fall under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). For analytical purposes the distinction is not critical, since medical treatment claims are assessed under the same

9

standard for both detainees and inmates. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).

To show that prison medical treatment was so inadequate as to have been unconstitutional, Bain must prove that the defendants' actions or omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The Second Circuit has stated that a medical need is "serious" for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998); *see also Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'") (quoting *Chance*, 143 F.3d at 702).

With respect to the question of "deliberate indifference," the Supreme Court explained in *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991) that this standard includes both an objective and a subjective component. With respect to the objective aspect, the Court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights. With respect to the subjective element, the Court must consider whether the deprivation was brought about by defendants in wanton disregard of those rights. *See Wilson*, 501 U.S. at 299. Therefore, to establish deliberate indifference, Bain must prove that the defendants had a culpable state of mind. *See id.*

The United States Supreme Court has made clear that mere negligence is not actionable under the Eighth Amendment. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim

10

of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.  Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind," or "incompatible with the evolving standards of decency." *Id.* at 102, 105-06 (citations omitted).  Furthermore, an inmate's "mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *see also Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("The courts will not intervene upon allegations of mere negligence, mistake or difference of opinion.").

Applying these standards here, the Court should find that there was no violation of Bain's Eighth Amendment rights.  The defendants' summary judgment motion focuses on the question of deliberate indifference.  The record before the Court at summary judgment makes clear that, once incarcerated, Bain received regular and considered treatment with respect to his pain management.  This treatment included review of Bain's prescription regimen by doctors both inside and outside the prison system.  Specifically, prison doctors consulted with the Pain Clinic at Dartmouth Hitchcock three times between 2004 and 2006.  When Dr. Hazard from the Pain Clinic recommended Neurontin, prison physicians prescribed Neurontin.  When Dr. Graubert from the Pain Clinic recommended low doses of Methadone, that recommendation was implemented as well.

During the time period in question, the medications used by DOC health care providers to address Bain's complaints of pain included Methadone, Vicodin, Flexeril, Neurontin, Acetaminophen and Ibuprofen. Bain's care was reviewed regularly, and various approaches were developed that often did not involve high levels of narcotics. Indeed, despite Bain's claims to the contrary, more than one physician concluded that narcotics were not his best option. Nonetheless, Bain maintains that he should have received narcotic medications at the level prescribed by Dr. Shapiro prior to his incarceration, and that anything less does not meet the prevailing medical standard.

As discussed above, a claim of negligence does not equate to an Eighth Amendment claim. *Estelle*, 429 U.S. at 106. Moreover, Bain's disagreement with his treatment, and his consistent efforts to obtain higher levels of narcotics, do not render his care unconstitutional. *Id.* at 107; *Chance*, 143 F.3d at 703. There is no indication in the record that any of the defendants acted with deliberate indifference, or even that the care they provided was medically inadequate.

Bain contests several of the defendants' factual assertions, and describes Dr. Cody's depiction of his medical records as "wildly inaccurate." He does not specifically dispute, however, the many efforts made by physicians both inside and outside the DOC system to address his pain needs. Moreover, Bain has submitted medical records dating back to the commencement of his incarceration in May 2003. Those records, although

incomplete, lend support to Dr. Cody's affidavit. (Doc. 93-2.)[1]

Furthermore, there is no support in the medical records for Bain's contention that the levels of narcotics provided to him by Dr. Shapiro represented the "prevailing standard of care." (Doc. 88 at 7.) Indeed, Dr. Graubert at Dartmouth Hitchcock Medical Center, whom Bain himself describes as an "expert in the treatment of chronic pain" (Doc. 88 at 8), states that the levels of narcotics Bain received prior to his incarceration "are doses beyond where I would recommend he go." (Doc. 93-2 at 16.)

Elsewhere in his response to summary judgment, Bain states that the levels of medication recommended by Dr. Graubert also represented "the prevailing standard of care." (Doc. 88 at 3.) As discussed above, Dr. Graubert recommended beginning Bain on 5 mg of Methadone four times per day, and the DOC subsequently provided Bain with 20 mg of Methadone per day, albeit in two 10 mg doses. Prior to the visit with Dr. Graubert, Dr. Miller had been providing Bain with even higher doses of Methadone. The appointment with Dr. Graubert was facilitated by DOC officials, as have other appointments with specialists outside of the prison system. In light of these facts, no reasonable juror could find that the defendants' efforts to manage Bain's pain constituted "deliberate indifference" to his needs.

On the question of detoxification, the medical screening form completed on May 23, 2003 indicates that Bain was placed in a "Detoxification Setting." (Doc. 93-2 at 16.)

---

[1] Courts in this circuit have generally held that when both plaintiff and defendants rely upon the same medical records, those records may be reviewed and considered at summary judgment. *See Goris v. Breslin*, 2010 WL 3576626, at *1 n.1 (E.D.N.Y. Jan. 26, 2010). Nonetheless, the parties are cautioned that in future filings, medical records should be properly authenticated and accompanied by an affidavit or certification pursuant to Fed. R. Evid. 803. *Id.*

This documentation corroborates Dr. Cody's representation that Bain was started on detoxification for Methadone upon his incarceration in May 2003. Moreover, as discussed above, Bain was provided medications to help him tolerate the symptoms of withdrawal. This evidence runs counter to Bain's conclusory and self-serving suggestion that the defendants failed to detoxify him when he arrived in prison. *See Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."). Even if the Court accepts Bain's allegation that he was denied detoxification treatment, he has not specified the nature of his resulting injuries. Because Bain does not support his claim of a failure to detoxify with any specific facts, records, or claims of injuries, the Court should find that the defendants are entitled to judgment as a matter of law on that claim. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

In sum, even when the facts are viewed in a light most favorable to the non-moving party, the record in this case does not support Bain's claim that the medical care he received after his incarceration in 2003 violated his constitutional rights. I therefore recommend that the defendants' motion for summary judgment on Bain's Eighth Amendment and Fourteenth Amendment claims be GRANTED.

## III. "Prevailing Medical Standards" Claim

The defendants next move for summary judgment on Bain's claims under 28 V.S.A. § 801, which requires the DOC to provide health care for inmates "in accordance with the prevailing medical standards." 28 V.S.A. § 801(a). The defendants construe

14

Bain's § 801 claims as one of medical negligence, and argue that without an expert, Bain cannot maintain his claim.

Under Vermont law, a plaintiff bringing a claim of medical malpractice must prove: (1) the proper standard of medical skill and care; (2) that the defendant either lacked the requisite knowledge or skill or failed to exercise this degree of care; and (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not have otherwise been incurred. 12 V.S.A. § 1908; *Lockwood v. Lord*, 163 Vt. 210, 213 (1994). "These elements must generally be proved by expert testimony." *Lockwood*, 163 Vt. at 213 (citing *Begin v. Richmond*, 150 Vt. 517, 520 (1988)); *see also Jones v. Block*, 171 Vt. 569, 569 (2000). "Except where the alleged violation of the standard of care is so apparent that it can be understood by a layperson without the aid of medical experts, the burden of proof imposed by [Vermont medical malpractice statute] requires expert testimony." *Provost v. Fletcher Allen Health Care, Inc.*, 179 Vt. 545, 547 (2005).

In this case, Bain was asked in discovery to disclose any medical experts who might testify about the defendants' alleged malpractice. Bain responded that he had submitted "an exhibit of an opinion by Dr. Graubert" to support his claim. (Doc. 76-6 at 2.) However, as discussed above, Dr. Graubert's recommendations were essentially implemented by the DOC, and nothing in his notes suggests that the defendants' treatment of Bain was below the prevailing standard of care.

Moreover, Bain has not formally designated an expert in compliance with Fed. R. Civ. P. 26(a)(2). (Doc. 76-3 at 4.) Dr. Cody has opined that "the medical providers

15

responded appropriately and promptly to" Bain's concerns, and that "the treatment provided to Mr. Bain is consistent with the prevailing standard of care." (Doc. 76-2 at 11.) With no expert to counter this testimony, Dr. Cody's conclusions are unchallenged. Furthermore, the standard of care in this case is not so apparent that a lay jury could determine the standard without the assistance of an expert. Accordingly, I recommend that the defendants' motion for summary judgment be GRANTED with respect to any claim of medical negligence, as well as Bain's claim under 28 V.S.A. § 801.

## IV. Conspiracy Claim

The defendants' final argument is that Bain cannot support his claim of a conspiracy under 42 U.S.C. § 1985. Bain's response to the motion for summary judgment (Doc. 93) does not counter this argument. Federal courts have the discretion to deem a claim abandoned "when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003); *see also Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."). Even if not deemed abandoned, the claim is unsupported by any relevant facts.

Section 1985 prohibits conspiracies to deprive individuals of the equal protection of the laws. *See* 42 U.S.C. § 1985(3). "In order to maintain an action under Section 1985, a plaintiff 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful

16

end.'" *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)). Conclusory allegations of conspiracies cannot withstand a motion to dismiss, let alone a motion for summary judgment. *See Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999).

Here, Bain has not offered any evidence of an agreement to violate his rights. Accordingly, summary judgment should be GRANTED in favor of the defendants on this claim. *See Sylla v. City of New York*, 2005 WL 3336460, at *7 (E.D.N.Y. Dec. 8, 2005) (granting summary judgment in favor of defendants when plaintiff failed to make any allegations regarding an agreement).

## **Conclusion**

For the reasons set forth above, I recommend that the defendants' motion for summary judgment (Doc. 76) be GRANTED, and that this case be DISMISSED.

Dated at Burlington, in the District of Vermont, this 26th day of August, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(d).